[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The parties were married on June 23, 1978, in Monroe, Connecticut. The birth name of plaintiff was Sue Ann Leopardi. The parties have resided in the State of Connecticut for the statutory period. Their child, Lisa Marie, was born on January 7, 1979. The parties are not recipients of any form of public assistance. CT Page 10479
The plaintiff testified that she perceived her marriage to be breaking down during the first year of their marriage. They were renting an apartment in Bridgeport, and did so for approximately 1 1/2 years. She claimed that he stayed away without explanation a few times per month. Those absences were for weekends, and when questioned about his whereabouts, he would ask "what are you doing, writing a book." When pressed for an answer with respect to his time spent away, he would yell. He claimed in his testimony that she nagged him all the time, and that it made it hard for him to go home to listen to all that. Her spending habits were of concern to him as well, and while she temporarily changed, it did not last.
At the time of the marriage, the plaintiff had approximately $20,000.00 in the bank from a property distribution from her earlier marriage. She worked outside the home, part-time after the birth of Lisa Marie, and principally supported the family. She claimed that the defendant failed to work, and to support the family. She purchased the appliances for the apartment for $2,500. and gave the defendant $1,000. to purchase a truck.
He had been employed, but his job terminated just before Lisa's birth. Rather than collecting unemployment, he received cash from his employer upon termination. The plaintiff claimed that he did nothing but hunt and fish during their respective seasons, and he played hockey.
As a result, the parties argued about his lack of support for the family, and her funds were expended. They seperated [separated] for approximatedly [approximately] 3 months, but he returned with a promise he would work for the union, and move to Naugatuck to a condominium which was purchased by the parties. The plaintiff's parents contributed $5,000. towards the down payment, and they secured a mortgage. The purchase price was $32,000.00.
The parties resided there for 6 years, until 1986. During that period, the plaintiff described the marriage as not pleasant. She claimed that he was verbally abusive, and that he threatened her. At one point, he CT Page 10480 grabbed her around the throat, and pushed her. He was there infrequently, continuing his hunting, field trials, and extra-marital affairs. She claimed that she met several of these women, and when confronted, he did not deny having affairs. She was aware of three or four women with whom he had had affairs. She filed for divorce when Lisa was about four.
The parties again reconciled. She testified that he promised that it would not happen again, and that he was sorry. He said he loved her and Lisa, and wanted to be with his family. The parties moved to Watertown in 1986 to the current marital home. The purchase of the Watertown house had to do with their reconciliation. They sold the condo in Naugatuck, and hurridly [hurriedly] purchased this home with the expectation that they would build.
Prior to their move, the defendant claimed that they had to sell the condo because of a refinance occasioned by her failure to pay the mortgage. He testified that she always claimed that she was unable to afford the mortgage because of his inability to earn enough to support the obligation.
After a few months, things reverted back to old habits. She claimed that he became more abusive at home, when he was there, and the marriage started falling apart again.
The parties did not vacation together, but he went on vacations by himself. He did not allow discussions concerning these vacations, claiming it was his money and he would spent it the way he wanted. Again, when confronted, he admitted his involvement with other women, as well as his activities as a sportsman. She claimed to have met three women that were admittedly his lovers. He always claimed it was none of her business.
The plaintiff filed for divorce again in 1987 or 1988. She testified that things always seemed to escalate around the holidays. He stayed in the home on the couch, because he had nowhere to go. They spoke about the divorce, and ultimately he signed the house over to her, saying he wanted to be single, and wanted nothing from the marriage. The date of conveyance was CT Page 10481 1989. During his testimony, he claimed that he conveyed this property to her to avoid the loss of the property because he had guaranteed a note on a piece of property in Newtown that was being foreclosed. He testified that he wanted to make sure his daughter had a roof over her head. He did not concede that he had given her that home to end their marriage.
The parties reconciled again on the day of the scheduled uncontested divorce. She was told that he wanted to go to counseling. She testified that she agreed because she thought, at that time, that she was doing the right thing for Lisa, who was 9. The parties went to counseling, with the defendant being involved in four sessions.
In October of 1990, she discovered that he was seeing a woman. His behavior changed again and he again stayed away from home. When confronted this time, he admitted that he was seeing someone, and that if she had turned the other way, it would have been over in a month. She talked on the phone with Julie von Blon on several occasions. When he was late one night, the plaintiff told him to pack his bags and leave. He moved in with Ms. von Blon and remained there for over three years. He claimed that she asked him to leave, and he said it was the last time he would let her do that to him. Thereafter, he claimed that he voluntarily paid her Two Hundred, Fifty ($250.00) Dollars per week.
He left the home on February 5, 1991, and she believed that the marriage had irretrievably broken down. She continues to so believe. The defendant testified that in 1991, the plaintiff again was behind with the mortgage, and that he took a check from an outside job for Three Thousand ($3,000.00) Dollars and had the owner of the home make the check payable to the plaintiff. (Defendant's Exhibit #19) Later during their separation, the mortgage was again in arrears. Their lender, Naugatuck Savings Bank met with them and they delivered to them a letter of agreement with respect to the repayment of the mortgage arrears. (Def. Exh. 9)
The witness testified that the defendant was affectionate and loving with their daughter when she was CT Page 10482 younger, but that he expected her to be tough. He derided her for her weight, and said if "she had half a brain, it would be lonely." He compared her to the dogs. He hit her if she misbehaved. He was "pretty mean" to her. He hit her head, back, arms, and if mom attempted to intervene, she would be pushed back.
Lisa is now 16 and a student at Sacred Heart High School, a parochial school in Waterbury.
Her financial affidavit discloses many debts for medical expenses. The total is $13,276.33, and the plaintiff claims that $2,000. of those expenses are hers. The balance are for the minor child. Dr. Jeremy August, a psychiatrist, treated her after she articulated that she wanted to die. Lisa was having trouble in school with her peers, felt abandoned by her father who did not exercise visitation, and the school officials felt she needs professional assistance.
Dr. August recommended certain things. As a result, the plaintiff and the defendant decided that Lisa should attend a private school. She did not want to go to Watertown High School because of problems with others girls in the junior high. The plaintiff claimed that all of these issues were discussed together, and they decided that she should attend Sacred Heart. The plaintiff testified that they discussed where the tuition would come from, and she suggested a few side jobs. He is a carpenter and has been such since the age of eighteen. On cross-examination, she agreed that at the time of this agreement, he was not living at the family home. Lisa was enrolled in Sacred Heart, and the defendant did pay the first $1,500. due prior to her admission. In November of 1993, when the second payment was due, the defendant refused to provide tuition payments for the child. On cross-examination, the plaintiff agreed that the defendant was then unemployed, and that he gave her three out of four checks from unemployment during that time.
The plaintiff feels that it is important that Lisa remain in Sacred Heart. She as a mother, has observed Lisa change from inward and quiet behavior, to violent and angry behavior. She lashes out at anyone who CT Page 10483 challenges her, then sinks back into tearfulness. The staff at Sacred Heart has been supportive academically and psychologically. She is in divorcing groups, and are actively involved in her educational development. The plaintiff feels she is intelligent and is most encouraged in this environment.
Lisa has tried to call her father, and has written to tell him about her feelings. The plaintiff testified that he went as long as six months without seeing her, and at the time of trial, had not seen him since the holidays. After seeing him, her behavior decompensates, and she suffers periods of readjustment. The plaintiff indicated that she has been borrowing to pay the bills at Sacred Heart.
On cross-examination, the plaintiff conceded that the tuition for 1993-94 was paid, but remains on her financial affidavit. Of that, she agreed that the defendant had contributed $1,500. For the 1994-95 school year, some of the tuition was paid and not reflected on the financial affidavit. She has paid $1,800. of this year's tuition, but the money was borrowed from the Dions' who are family friends, which money has yet to be repaid. That debt is also not reflected on her financial affidavit.
The plaintiff conceded that Lisa had been granted a scholarship to Sacred Heart in the amount of $450.00, which sum was for this school year. She claimed that that was computed in her financial affidavit.
The remaining medical bills are various medical problems not uncommon for a child in adolescence. Some blood work was done at the request of Dr. August to determine if there might be a chemical imbalance. Most of the medical bills have been incurred since the separation of the parties. The plaintiff claimed that her requests for assistance with these bills were refused by the defendant.
During the defendant's direct examination, he denied any problem in his relationship with his daughter, and stated that he knew of no time when she was suicidal. He testified that "she is fine when she is with me." He CT Page 10484 denied that he insulted her in any way in the past and that he would take custody if Lisa wanted to move in with him. He said that his relationship with Lisa was fine, and that after the restraining order, it changed. He claimed that his wife had made his relationship with his daughter much worse.
The defendant had medical insurance for fifteen years with the union, as he worked union jobs. The union provided the coverage, plus dental and eyeglass coverage. He was able to continue to be covered when he was unemployed, because the plaintiff paid the premium. The last time the union insurance was in effect was approximately October of 1993. The plaintiff asked him to maintain that coverage because of Lisa's treatment, and he let it lapse. He refused to pay to maintain the insurance. On cross-examination, she indicated she did not know whether the insurance extended until March of 1994. When she was employed by physicians, she submitted medical bills. The medical bills on her financial affidavit were submitted when applicable. Some of the bills were submitted under her insurance, even though she was also covered on his policy. In his testimony on direct, the defendant testified that the coverage expired in March of 1994. He also claimed that they argued about her going to the doctors until she found one who would tell her something was wrong with her.
On cross-examination, she denied asking the court to order a continuation of medical insurance for her, but rather that she did ask that he continue it for Lisa. Her own medical insurance was in effect until March 1, 1995. She was covered through the period of their separation, as she was during periods of employment.
The plaintiff was employed during the course of the marriage, except when she was pregnant. Her employment has not always been full-time. She worked at Carroll Manufacturing in Naugatuck for four years, was laid off, and obtained a new job immediately as indicated on her financial affidavit. Her usual employment has netted her weekly income of just under $300. She does bookkeeping, and is in school. She attends Mattatuck (Naugatuck Valley Community Technical College) evenings on Friday nights and has been doing so for a number of CT Page 10485 years. She is pursuing an Associates Degree in Accounting.
For approximately fifteen (15) years, the defendant worked on union jobs, the longest one being for one and one-half years. He also did side jobs, constructing decks, remodeling of homes, and the like. Most of the time, when he was laid off from a union job, or when jobs became available, he would perform them for his spending money. The family suffered some financial hardship when he was on unemployment, and the defendant did not contribute any side job money to the household.
The defendant continues his hobbies as a sportsman, and has purchased six long guns, reloading equipment and ammunition, clothing, five fishing poles, fly making equipment, and the like. He also had English Pointers for hunting, and at one time, had as many as five dogs. The plaintiff testified that she was not privy to the cost of the dogs, but had seen some receipts for $600. for firearms, and at least one bill from Cabella's for clothing for $500.
The plaintiff suffers from nervous disorders, ulcers, and mitral valve prolapse. She testified that her health has been compromised by the marriage. When he left, he left some of his tools, some of his hunting and fishing equipment, and trash. She testified that she asked him to remove those items, to which he responded that he would take them when he was good and ready. She sold some of those items when he refused to contribute to Lisa's tuition at mid-term. She collected approximately $2,000. and gave the money to Sacred Heart.
She did not sell any of his guns, but did sell welders, mechanics tools for cars, aluminum siding equipment, wheelbarrows, ladders, and the list of items is in the court file. The defendant was ordered to remove the rest of his items from the marital home, and came that day and took a truck load out of the house. The next weekend his brother took another truck load out, and no other items have been removed. She claimed that it would cost her $300. to clean up the garage, which has always been filled with defendant's construction material. She described it as looking like "Sanford and CT Page 10486 Sons."
She described her heart condition, mitral valve prolapse. She has shortness of breath, heart palpitatiions [palpitations], for which she takes medication. She could have surgery which is only done on an emergency basis. She is somewhat restricted in her life's activities because she tires easily.
The plaintiff claimed that the defendant did not properly maintain the real estate in Watertown. The defendant had planned to add a new deck, but did not, after he had ripped off the old deck. There is presently a hole in the ground the length of the sliders. It is the only back entrance to the home.
When he left the bathroom needed repair because of a leak from the shower down a wall into the garage. The kitchen faucet leaked, so he pulled the pipes out, and left them. The stove burner unit did not function, but he refused to repair it. The dogs dug up the yard, but he did not relandscape, and the kennel was in disrepair. He refused to take the last dog, and then refused to dismantle the kennel pursuant to the court order. The cost to remove the kennel is unknown to plaintiff because of the size and composition of the kennel.
The defendant claimed that the house was in good repair when he left the marital home, and that if any of the problems exist, they came about post-separation.
On cross-examination, the plaintiff agreed that she started dating someone several months after the parties seperated [separated]. The person happens to be the son of her attorney. The plaintiff obtained an ex parte restraining order at the commencement of this specific divorce proceeding. The defendant contends that the plaintiff sought a restraining order to prevent him from seeing Lisa. The court noted that on March 7, 1994, the issues of custody and visitation were dealt with, and the defendant was given liberal and flexible visitation with Lisa. (West, J.) The restraining order has been continued without opposition on December 27, 1993, which prohibited him from contacted either the plaintiff or the child. CT Page 10487
The defendant further produced a letter from Atty. Caufield which is Defendant's Exhibit 3, asking the defendant to remove his belongings with a police escort. The plaintiff was cross-examined with respect to the personal property. There was no mutual restraining order on assets imposed by the court at the request of either party, and the parties made an agreement in court with respect to the personal property, and some arrangements were made.
The plaintiff testified on cross-examination that she, as a bookkeeper, did the books of the family. They had four checking accounts. She had to direct deposit her paycheck from a bank into an account at that bank. There was an account after the defendant filed bankruptcy, and a foreclosure. The quit claim of the defendant's interest in the marital home occurred at approximately the same time. The parties had always held their property jointly until the filing of the bankruptcy.
The plaintiff and the defendant received their mail at the family home, and the plaintiff maintained a post office box of her own, unknown to the defendant. She started having a post office box during one of their separations. She claimed that he opened her mail, and she did not feel he had the right to do that.
The plaintiff was questioned concerning food shopping at LaBonne's. Checks were written, concededly, for food with cash received back. From April to June of 1989, several checks were written at food stores, and the plaintiff conceded that there may have been cash for gas, lunch money, money for the defendant. This may have been done while plaintiff worked at a bank. One of the checks was for cash, and was negotiated at the bank. The plaintiff testified that she spent much more on food when she and the defendant lived together. Some of the purchases were on the same day. The plaintiff agreed that that was not uncommon. During the defendant's testimony, he continued to refer to her check cashing practices as her "skim" from their income, and the reason why they had so many financial difficulties. While she was a bookkeeper, and while he did not access the CT Page 10488 checkbook often, he claimed that her spending habits ruined him financially.
This is her second marriage, and his first. He has a high school education, and she is nine credits into her Associates Degree. She has had a variety of jobs which were clerical, medical assistant, licensed to sell real estate for a year or two when defendant was in his own business of building houses.
Within the last few months, the parties discussed having Lisa move in with her father. She struck her mother on one occasion, and agreed that he would not be abusive to her since she contemplated a change of residence.
The parties cohabited prior to the marriage, and the impending birth of Lisa occasioned the marriage. She conceded that he worked hard, but that he was not that good a provider. He kept money for himself. He questioned her about why there was no money. The defendant challenged the plaintiff with her spending habits, and asked whether she considered herself a compulsive spender. He wore a traditional "blue collar" wardrobe, and she testified that she bought necessary clothing for herself and the child. She objected to his retaining funds of his own, largely because of his use of those funds. Otherwise, the allegations with respect to her spending were denied by the witness.
The parties shared at least one checking account, Defendant's Exhibit 6. She claimed that in 1993, the defendant did not pay the mortgage on the family home at all.
The plaintiff admitted that she spanked Lisa and slapped her face once. She conceeded [conceded] that Lisa went to summer school and is presently flunking geometry. When questioned concerning less expensive therapy, she said she had not considered that. When asked whether or not she had sought a second opinion with respect to her daughter's diagnsis [diagnosis] and treatment, she said no.
She testified that she did have an IRA, but that it is not listed on the financial affidavit. When asked by CT Page 10489 the court, the witness indicated that the value of the IRA was less than $200. On redirect examination, she testified that problems concerning arrearages on their mortgage for the marital home occurred in 1991 prior to their final separation. She also indicated that he retained sums of cash approximating $12,000.00, in a lock box in the home, and in a tool drawer. When confronted with this fact, upon her discovery thereof, the defendant said it was necessay [necessary] to keep the case a secret because otherwise she would have spent it. The comment seemed to be consistent with the claim of the defendant that the plaintiff was a spendthrift.
The parties had a serious conflict concerning the sale, by the plaintiff, of certain tools belonging to the defendant. The chronology of the sale and the need to pay tuition for their minor child became the subject of extensive testimony. The defendant also was served with a restraining order prior to the agreement, in court, to retrieve those tools. The defendant claimed that he was not given a sufficient amount of time to secure his belongings, and when he went to the house, he was ordered by the police off the property. He testified that he was not given an opportunity to remove the property before it was sold. Thereafter he was ordered by Judge McDonald to go to the house to empty out the garage, but he claimed that he still did not have time to clean out the garage. He has personalty at the house, including an architects file, and does not know what else remains. He wants the dog pen and an oak table. He request nothing more of the court from the marital home.
The defendant was called by the plaintiff. He currently is residing in Monroe, with his mother who does not charge him room and board, and is employed as a carpenter/contractor, as he has been since 1974. In 1980, he became a union carpenter. In 1993, he was employed in Newington, for Saturn Construction, as a union carpenter. He had the job for six (6) months from January to April and from July to October 1, 1993. He earned $19.10 per hour and worked forty (40) hours per week generally. He is currently self-employed doing odd jobs, but is not engaged in union projects at this time, and has not been so employed since October of 1993. CT Page 10490
He claims one job in Stamford, in November of 1994, where he earned $2,000.00. That job expended 300 hours. He then did a house in Wethersfield, in January of 1995, where he billed $5,000.00, and has collected $2,500.00. That job lasted one month, and he was assisted by two helpers. The defendant testified they all worked six days per week for eight hours per day. All helpers were paid between $125. and $150. per day. The defendant testified that he had no other jobs in 1995.
The defendant collected unemployment compensation until September, 1994, after he left Saturn. He was collecting approximately $315.00. per week. He indicated that he sought work with Local #24 of the carpenter's union, but was unable to be employed. The union heardquarters [headquarters] is in Wallingford. He did not access any other union offices other than in Wallingford. There are two carpenter unions in Connecticut, which have sub-offices in many of the cities and large towns in the state. His last request for union employment was within the last month. He has gone "once in a while" to the union office to seek employment. He denies seeking employment through any other employment agencies, and or companies. Most of his employment came from word of mouth. He did not seek employment in any other trade or industry. The defendant claims to be a very good carpenter, and in fact is given complicated jobs on sites.
The defendant testified that he has no current living expenses, because they are bourn by his mother. He owns a 1985 Toyota Pickup, which was purchased in 1992. He testified that he has not been allowed to use any other motor vehicle since October of 1994. He testified that from then until the date of trial, he used monies from his independent jobs and cash borrowed from his mother to purchase gas.
When pressed, the defendant testified that his mother gave him lump sums of money, the times and amounts he could not recall, other than one gift of $1,000. When asked if he had been away from the State of Connecticut since October of 1994, he replied that he had been in South Carolina and Georgia for seven (7) days in February, and for four (4) days in New Jersey, when he CT Page 10491 attended field trials, claiming that he did not bring his dog to compete. He claimed that he went to South Carolina and Georgia to look for work. The defendant testified that that was what his mother gave him the $1,000.00 for. He has been to Florida within the last couple of years, but he drove down with a friend and stayed in Florida with a friend. He claimed he had no money with him when he went to New Jersey, and that all of his expenses were covered by someone else.
The defendant testified that he has a job lined up as a construction supervisor in Sebastian, Florida. He got the job through Gary Kaczenski, a friend, who is "third in command" at the company. He will earn $13.00 per hour, and is unsure of any other benefits that may be added. He took this job, and could have started the job in August of 1994, but he waited for this divorce. He claimed in his testimony that the divorce was the only reason he stayed in the State of Connecticut. Union carpenters are earning between $12. and $19. per hour in the State of Connecticut. On cross-examination, the defendant testified that Mr. Kaczenski has always been his source of employment in the State of Connecticut, and that he asked him for work when he was about to run out of unemployment.
The plaintiff called Peter Limosani, a representative of Local #24 Carpenters' Union. He is currently the business manager of the union that covers all areas of Connecticut but for Hartford County. He testified that current union wages are $19.10, for prevailing wage work on large buildings, $18.55, for highway and bridge repairs, and $17.25, market recovery program. A union carpenter would be eligible for any of the classifications of employment if the job was available. Mr. Limosani described the availability of work in Connecticut. He indicated that the jobs are given to those people who come in and continually ask for work. He further indicated that most work was word of mouth, but he loses out as the agent. There are union jobs, and are on the books, but are not necessarily from the union office. To get a job, a person must call around, and report to the union hall, and seek out other union people on jobs in progress. CT Page 10492
On cross-examination, the witness opined that people who are good workers and customarily the last one laid off, are in the office looking for work. Generally, he indicated that there are many union carpenters out of work, although there is work.
The defendant claimed on his direct examination that he had been blackballed, because he had run for business manager against the witness, and that regardless of his attempts to find work through the union, he would not be assigned.
The plaintiff called Mathew F. Cepece, of Norwalk. He is general counsel for Carpenters' Union Local #210 represents areas in Fairfield County, some of New Haven County, and Litchfield County. They also represent some town employees, maintenance workers, and some small shop workers. The wages which differ by county and function, but range from $17.25 to $19.75 per hour for union carpenters. The witness testified that the demand for carpenters is there, and work is available in Connecticut.
On cross-examination, the witness testified that when jobs are available, members of other unions can be placed, but there are policies preferring members of Local #210. After the plaintiff rested, Mr. Capece was called as the defendant's first witness with respect to whether or not psychiatric care was provided through the union medical plan. It does. A member must work a certain number of hours per quarter to maintain eligibility. If the member has enough hours, and is not working in the quarter, then COBRA benefits come into place, which requires the member to pay. The cost is approximately $450. per month for a family plan.
The defendant was asked to identify many checks from the family accounts, signed by the plaintiff, to bolster the claim of the defendant was not careful with the family money. He offered a ledger, and a summation (Def's Exh. 12) of expenditures which he considered "legitimate." There was heated debate concerning the relevance of the testimony. The defendant testified that he was unable to demonstrate how much income he deposited into the family accounts because she had all the records, CT Page 10493 including the tax returns, so that the court could rationally assess the financial claims of the parties.
During the defendant's testimony concerning his self-employment prior to his bankruptcy, he testified that he gave the plaintiff approximately Five Hundred ($500.00) Dollars per week to cover the family expenses.
He claims to have tendonitis in his master arm, his right arm. He also has a torn rotator cup from a hockey injury, and asthma. His health is otherwise good.
In 1986, he began another company, which monitored ground shock, required of blasting contractors by fire marshals. He did not receive a salary, but did receive Ten Thousand ($10,000.00) Dollars when the business was sold. He put the money in a "fireproof box" so the plaintiff would not spend it all at the same time. He was in MKF Builders at that same time.
During the proceeding, the minor child came to court and wanted to ask him certain questions. His testimony was that she gave him her beeper number, and wanted to know if he did not contest custody that he was not interested in her. He claimed that he was served in three counties a total of ten times by the plaintiff for divorce.
On cross-examination, the witness was asked in the fifty-one (51) months how many restraining orders were entered which prevented visitation, and he responded that there were three months when he was not able to see Lisa. Since January, 1995, the defendant has seen his daughter three times.
The court asked that Dr. Jeremy August, the child's psychiatrist, testify. The testimony of the parties was remarkably inconsistent concerning the well-being of the minor child, and concerning her relationship with her father. Counsel was appointed for the minor child to determine whether or not she would waive her privilege for the purpose of the court's hearing that testimony to adequately assess the credibility of the parties in this case. Dr. August testified concerning his impressions of the mental state of the child, which findings will not be CT Page 10494 repeated here. The court believes that there are serious issues of privacy for the minor child.
The court can find from the testimony, however, that the plaintiff's testimony concerning the child to have credibility. The child is clearly in need of parochial school education, a decision which had been made by the parents earlier. Their final dissolution action has been an impediment to continuing that decision for the long-term benefit of the child.
The father's relationship with the child has been affected by the defendant's overall treatment of women, especially the plaintiff. The court finds that he has been historically unfaithful to the plaintiff, and has calously [callously] dismissed her attempts to have him understand how hurtful and demeaning that conduct was to her. Clearly, the plaintiff's decision to stay in this marriage "for the child" has not been a good one. The on-again, off-again nature of the parental relationship has been chaotic, and for a child who needs discipline and routine in her life, that process of conflict between the parents while they were married was a negative influence in her life. That coupled with the defendant's inattention, his uncomplementary words and tone, escalated her problems. The parents of this child have a long way to go in raising her. They are ordered to cooperate with her continued therapy, and shall engage in whatever couples therapy or family therapy is required by her doctor. The court questions seriously his desire to move to the State of Florida to find work. The special needs of this child should make him consider seriously a need to be closer and more involved in her life.
The court also finds that the needs of this child would be best served with an order of sole custody in the mother. The defendant, in his claims for relief, does not ask for anything but reasonable visitation, and has indicated a plan to move from the State of Connecticut. The father shall visit consistently on a schedule that the parties and the child adopt.
Based upon the evidence found credible by the court, and in light of the statutory criteria, the court makes the following orders with respect to financial issues. CT Page 10495
1. CHILD SUPPORT. The defendant shall pay child support in the amount of Eighty-four ($84.00) Dollars per week pursuant to the Guidelines established on his ability to earn. The defendant shall provided health related insurance for the minor child. Her health needs will continue, and there should be no lapse of coverage for the child. The defendant shall be responsible for the payment of outstanding bills which are health related and which accummulated [accumulated] during the pendency of this action. The defendant testified that medical insurance was in place, and that they should be covered. The court anticipates that he will submit the bills, and pay unreimbursed expenses.
From the date of the judgment forward the parties shall share the cost of unreimbursed health expenses for the minor child, so long as there is medical/health insurance in place pursuant to this order. The court orders that the defendant be responsible for the cost if he fails to honor the order of the court as to insurance.
2. REAL ESTATE: The plaintiff shall retain title to the marital property as her exclusive property. The court has found that the conduct of the defendant was the primary cause of the breakdown of the marriage. His decision to seek employment out of the State of Connecticut will inevitably increase the burden of care of the minor child on the plaintiff for all purposes. The expected difficulties in enforcing this judgment is also a consideration for the court. She shall be solely responsible for the outstanding mortgage, taxes, and insurance on the home.
3. ALIMONY: The defendant shall pay the sum of One ($1.00) Dollar per year as alimony, until the plaintiff remarries, cohabits pursuant to the terms of the statute, or dies.
4. EDUCATION: During the minority of the minor child, the parties shall share the cost of parochial education for the minor child.
5. ATTORNEYS' FEES: The parties shall each be responsible for the payment of their respective CT Page 10496 attorneys' fees. The court has taken into account the other financial awards in so ruling.
6. PERSONAL PROPERTY: The court finds that the defendant is not entitled to be compensated for any sale of his personal items. He was not complying with his agreement to afford parochial education for their child who was in such great need, and did not comply with the order of the court to remove the personalty in a timely manner. Furthermore, the court does not find credible his claim that he has been unemployed, and without funds. The court does not credit his claim that one restraining order of three months duration affected his ability to see his child, remove his property, or otherwise provide support for his family.
The parties shall retain the property presently in their respective possession.
A judgment dissolving the marriage shall enter, as well as other orders consistent with this opinion.
DRANGINIS, J.